NOT FOR PUBLICATION

FILED

JAMES J. WALDRON, CLERK

[MARCH 27, 2013]

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: Christopher Fowler, Deputy

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| MICHAEL T. CALLAHAN and KATHLEEN P. CALLAHAN, | CASE NO. 10-44610 (GMB) |
| Debtors. | |
| SHARON T. LECHNER, | ADVERSARY NO. 11-1174 (GMB) |
| Plaintiff, | |
| v. | |
| MICHAEL T. CALLAHAN, | MEMORANDUM OPINION |
| Defendant. | |

APPEARANCES:    Sharon T. Lechner
341 Lochmoore Loop
Myrtle Beach, SC  29588
Appearing Pro Se

Bruno Bellucci, III, Esquire
Law Offices of Bruno Bellucci, III, P.C.
747 Shore Road
P.O. Box 359
Linwood, NJ  08221
Counsel for Defendant

Before the Court is a complaint to deny discharge of debt pursuant to 11 U.S.C.

§523(a)(2)(A) (the "Complaint") filed by Plaintiff Sharon T. Lechner (the "Plaintiff" or

"Lechner") against Michael T. Callahan (the "Debtor" or "Defendant"). Following a trial on the merits, and for the reasons stated below, the Court will deny Plaintiff's request to exclude the debt owed to her from discharge.

I.   **BACKGROUND**

Plaintiff was the owner of a motel located in Wildwood Crest, New Jersey, when she first met the Debtor. Debtor and his business associates approached Plaintiff and several other property owners in the immediate area regarding the purchase of their respective properties for redevelopment and eventual sale. Plaintiff, after meeting with Debtor and his business associates, agreed to subdivide the parcel of land upon which her motel sat and sell three of the four subdivided parcels to an entity related to the Debtor and his business associate, Mr. Goodman. Plaintiff kept for herself the remaining subdivided parcel of property. The three subdivided properties were purchased from Plaintiff for a total purchase price of $550,000. Plaintiff was represented during all of the aforementioned transactions by attorney Louis J. Belasco, Jr.

Immediately after the sale, Plaintiff agreed to reinvest $400,000 of the proceeds from said sale into an entity by the name of SeaFar, LLC ("SeaFar"), a limited liability company of which both Debtor and Mr. Goodman were members. When asked why she would invest such a significant sum in Debtor's business ventures, the Plaintiff replied that she believed that Debtor and his business associates were good people that were "just getting started," and she thought the deal would be mutually beneficial. To that end, on February 10, 2005, the Plaintiff loaned SeaFar $400,000 in exchange for a guaranty, promissory note, and a mortgage on a piece of real estate (the "Loan"). More specifically, Debtor executed a guaranty in favor of Plaintiff for the

2

Document    Page 3 of 11

amount of $400,000 (the "Guarantee").[1] SeaFar executed a promissory note in the principal sum of $400,000, with interest on the outstanding balance at the rate of 8% per annum, with a balloon payment due on or before February 10, 2007 (the "Promissory Note"). Finally, a second mortgage was executed in favor of Plaintiff on the property located in Wildwood Crest, being known as Lots 10, 11, 12 and 13, of Block 97 of the tax map of the Borough of Wildwood Crest (the "SeaFar Property"). Plaintiff's mortgage on the SeaFar Property (the "SeaFar Mortgage") was second in line to a mortgage dated March 8, 2004 in the amount of $1,589,500.00 in favor of Parke Bank. The Debtor and his business associates, including Sturdy Construction, LLC, planned to develop the SeaFar Property into four separate residential structures and then sell them for a profit. Again, during all of the aforementioned transactions, Plaintiff was represented by attorney Belasco.

Throughout the remainder of 2005 and into 2006, the residences on the SeaFar Property were being completed. In order to convey clear title to the purchasers, as the residences were finished, Plaintiff's blanket mortgage on the SeaFar Property had to be partially discharged as to each particular parcel. To that end, Plaintiff signed a "Partial Release of Mortgaged Property" as to Lot 12 on August 22, 2005 and a "Discharge of Mortgage" as to Lots 10 and 11 on December 15, 2005. No partial release or discharge of mortgage was provided to this Court by either the Debtor or Plaintiff as to Lot 13 of the SeaFar Property.[2] Plaintiff was represented by attorney Belasco with respect to each of the aforementioned releases.

---

[1] Personal Guaranties were also executed by Mr. Goodman and Mr. Ciminera, a member of SeaFar, LLC, in connection with Plaintiff's $400,000 loan to SeaFar. Plaintiff has represented that she has not sought to recover the monies loaned from either Mr. Goodman or Mr. Ciminera.

[2] This Court finds it interesting that Lot 13, the only parcel of the SeaFar Property for which no discharge of mortgage or partial release has been provided to the Court, was the same parcel that was sold to Joseph J. Ciminera, Jr., the individual who allegedly structured the SeaFar Project and was involved in all of the above transactions. The HUD statement pertaining to Lot 13 recites a payoff of first mortgage loan to Parke Bank in the amount of

As the Plaintiff's outstanding loan to SeaFar was no longer fully secured by the SeaFar Property, the Plaintiff received substitute collateral in the form of a third mortgage on a beach-front property owned by a related entity, Sand Castles, LLC (the "Sandcastles Property"). The third mortgage was made on February 9, 2006 between SeaFar as the borrower, Plaintiff as the lender, and Sandcastles, LLC as the mortgagor (the "Sandcastles Mortgage"). The Sandcastles Mortgage specifically provided that there were two primary liens existing on the property: first mortgage dated March 9, 2005 in the amount of $4.5 million in favor of Royal Bank and second mortgage dated March 9, 2005 in the amount of $1.98 million in favor of Seton Enterprises, Inc. The Debtor testified that the Sandcastles Property was purchased in 2005 with the intention of demolishing the existing beach front motel and redeveloping the property into high-end condominiums. The Plaintiff was represented by attorney Belasco during the Sandcastles Mortgage transaction.

In February 2007, around the time of the maturation of the SeaFar Note, the Plaintiff and SeaFar entered into a loan modification agreement (the "2007 Loan Modification"). The 2007 Loan Modification provided that all of the terms and conditions contained in the SeaFar Promissory Note and the Sandcastles Mortgage were incorporated therein, but that the payment terms would be amended to provide for sixteen (16) quarterly payments of interest only and a balloon payment due on or before February 1, 2009. The 2007 Loan Modification was executed by Debtor, as managing member of SeaFar, and Plaintiff in her own capacity. When Plaintiff was asked why she entered into the 2007 Loan Modification, she gave the following testimony:

> I felt that I was friends with these people and I wanted to help them…
> because I felt that I was friends with these people and I really wanted to
> help them… I wanted them to continue their business… so that they… I

---

$460,263.20 and payoff of second mortgage loan is left blank, with Ciminera receiving approximately $261,394.09 at settlement.

4

> mean, Mr. Callahan is a young man, he has a family… a young family… I just didn't want to see anything go wrong with … you know… that's the kind of person I am… I'm the kind of person that tries to help people and in this instance I ended up getting hurt…

Audio Transcript, February 7, 2013, 12:00:28 P.M. It is unclear from the face of the 2007 Loan Modification Agreement whether the Plaintiff was represented with respect to this particular transaction.

At some point in or around 2007-2008, the Sandcastles Project began experiencing difficulties and Royal Bank, the first mortgagee, threatened to foreclose on the Sandcastles Property. The Debtor testified that several interest payments were made by SeaFar to the Plaintiff during this time, but the project eventually went under and Royal Bank foreclosed upon the Sandcastles Property.[3] Plaintiff estimated that she received approximately $32,000 in interest payments during this time.

In or around February 2008, presumably as a result of the loss of her secured interest in both the SeaFar and/or the Sandcastles Properties, the Plaintiff was contacted by the Debtor and his business associates regarding the possibility of substitute collateral in the form of an assignment of membership interests in an entity by the name of T&C, LLC. According to the February 6, 2008 letter sent by Mr. Belasco, Plaintiff's attorney, to Andrew D. Cantanese, an attorney representing SeaFar and involved in many of the aforementioned transactions (the "February 6, 2008 Letter"), the Plaintiff would consider substitution of collateral provided that certain concerns regarding assignability and value were adequately addressed.[4] The February 6, 2008 Letter to Mr. Cantanese specifically states that "[b]y engaging in discussions on substitute

---

[3] There have been no documents or evidence submitted with respect to any foreclosure proceedings relating to the Sandcastles Property. However, the Plaintiff does not dispute this fact.

[4] It is significant to note that the Plaintiff was copied on the February 6, 2008 Letter to Mr. Cantanese.

collateral, I just want to confirm that my client is not giving up any of her rights under the original loan documents to pursue any and all legal and equitable remedies that may be available to her." See Plaintiff's Exhibit G. The February 6, 2008 Letter is also significant because it indicates Plaintiff's knowledge regarding the Sandcastles Mortgage as collateral for the $400,000 Loan to SeaFar. The subject line reads as follows:

> **RE:   Sharon Lechner**
> **$400,000 Loan to SeaFar, LLC**
> **(Collateral Mortgage Sandcastles, NJ, LLC**

Plaintiff's Exhibit G. The content of this particular subject line is important because, according to the Plaintiff's Testimony, she was unaware that her $400,000 Loan was secured by the SandCastles Property. The February 6, 2008 Letter cited above clearly evidences both Plaintiff's and her attorney's knowledge that the $400,000 loan was to SeaFar and that the collateral securing said loan was over the Sandcastles, NJ, LLC Property.

It is unclear whether any membership interests in T&C, LLC were ever actually assigned to the Plaintiff as substitute collateral. However, it seems clear that by April 21, 2009, any interest the Debtor may have had in T&C, LLC was declared null and void, as having zero monetary value, due to default by the Debtor. Moreover, according to the T&C, LLC operating agreement, no pledge would have been permissible without the agreement and approval of all members owning more than 50% of the then current percentage interest of the profits as set forth in the agreement.

As the real estate market was crashing in or around 2008-2009, the Plaintiff was left with an unsecured or severely undersecured outstanding loan to SeaFar in the amount of $400,000. The Debtor alleges that the sales of the homes located on the SeaFar Property were insufficient

6

to generate profit sufficient to pay Plaintiff and that the Sandcastles Property was lost to foreclosure. There is nothing in the record that supports a contrary account of events.

On November 5, 2010 the Debtor filed for bankruptcy protection in this Court under Chapter 7 of the Code. On February 15, 2011, the Plaintiff timely instituted this adversary proceeding, seeking to prevent the Debtor from discharging her debt in his bankruptcy case. The Plaintiff has been acting *pro se* since the inception of the adversary proceeding and has been proceeding on one count, 11 U.S.C. §523(a)(2)(A). The Debtor filed a Motion for Summary Judgment on January 22, 2013, which was denied by this Court on the scheduled trial date, February 7, 2013. The parties proceeded to trial, Plaintiff acting *pro se.*

## II.    JURISDICTION & VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. §157(b)(2)(A), (I), and (J).

## III.    DISCUSSION

One of the fundamental purposes of the Code is to provide an opportunity to "relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start." Ins. Co. v. N. Am. Cohn (In re Cohn), 54 F.3d 1108, 1113 (3d Cir. 1995). However, the Supreme Court has explained that there are limits to the "fresh start" doctrine. See Grogan v. Garner, 498 U.S. 279, 286-87 (1991). "Where a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors." Cohen v. De La Cruz (In re Cohen), 106 F.3d 52, 59 (3d Cir. 1997). The burden of proof for the dischargeability

7

exceptions in 11 U.S.C. §523(a) is the ordinary preponderance of the evidence standard and that burden is on the plaintiff.  *See* Fed.R.Bankr.P. 4005.

The Plaintiff argues that she is entitled to relief based upon 11 U.S.C. §523(a)(2)(A).  For the reasons that follow, this Court finds that the Plaintiff has not carried her burden of proof by a preponderance of the evidence for the relief requested.

Section 523(a)(2)(A) provides for an exception to discharge for "an individual debtor from any debt … for money, property, [or] services … to the extent obtained by …false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. §523(a)(2)(A).  For a debt to be nondischargeable under section 523(a)(2)(A) the creditor must prove that:

> (1) the debtor represented a fact, opinion, intention or law;
>
> (2) the representation was false;
>
> (3) the representation was material;
>
> (4) the debtor obtained money, property or services through the misrepresentation;
>
> (5) the debtor knew at the time that the statement was false (or was made with reckless disregard for its truth);
>
> (6) the debtor intended the creditor to rely on the statement;
>
> (7) the creditor actually relied on the statement;
>
> (8) the reliance was justified;
>
> (9) the creditor sustained damage; and
>
> (10) the damages were the proximate result of the false representation.

8

De La Cruz v. Cohen (In re Cohen), 191 B.R. 599, 604 (D.N.J. 1996), *aff'd sub nom.*, 106 F.3d 52 (3d Cir. 1997), *aff'd* 523 U.S. 213 (1998).

Courts will often turn to the "totality of the circumstances" because they recognize that a debtor will rarely admit to fraudulent knowledge or intent, which is required to prevail under this section of the Code. *See* Strominger v. Giquinto (In re Giquinto), 388 B.R. 152, 156 (Bankr.E.D.Pa. 2008). Moreover, courts should afford particular weight to "whether the debtor undertook any of the steps necessary to perform as promised." Id. at 167. Finally, when assessing whether a debtor intended to deceive a creditor, the court must look at the debtor's intent at the time the misrepresentation, if any, was made. See Field v. Mans, 516 U.S. 59 (1995).

In the instant case, the Plaintiff has failed to establish most, if not all, of the elements required to prove fraud under §523(a)(2)(A). At the outset, it should be reiterated that while the Plaintiff acted *pro se* during this adversary proceeding, the Plaintiff was represented by counsel during all of the transactions at issue, with the only possible exception being the 2007 Loan Modification Agreement.

The Plaintiff has failed to point to any representation made by the Debtor of fact, opinion or intention that was false when made or material. The Plaintiff has failed to allege, much less prove, that the Debtor obtained money, property or services through any such misrepresentation. It is admitted that SeaFar obtained money from the Plaintiff for the purpose of developing certain parcels of real property to eventually sell at a profit, but Plaintiff has failed to allege that any misrepresentations were made at the time of the February 2005 Loan. When the $400,000 Loan was made by the Plaintiff to SeaFar in 2005, the Debtor and Plaintiff both believed that she would not only be paid back, but that she would also receive a healthy return on her investment.

9

Even if the Plaintiff had alleged that Debtor made some relied upon misrepresentations regarding the use of the $400,000, the Plaintiff has failed to show that any such reliance would have been justified or reasonable. The Plaintiff retained counsel in nearly all of the aforementioned transactions and both Plaintiff and Debtor testified at trial that many of the pertinent documents were indeed drafted by Plaintiff's counsel, Mr. Belasco. The Plaintiff agreed to release, at least partially, the SeaFar Mortgage and take a third position behind two lenders that had security interests in the Sandcastles Property totaling over $6 million. Even with respect to the SeaFar Property, the Debtor was always second to the primary lender, Parke Bank, and it is doubtful that the $400,000 was ever fully secured.

As noted above, the Debtor entered into the February 2007 Loan Modification, which significantly altered the terms of her repayment to her detriment, because she wanted to "help [the Debtor] out." (Audio Transcript, February 7, 2013, 12:00:30 P.M.). The Plaintiff testified that she was trying to "help out a friend" and she recognized that, at least in this instance, "she got hurt." Id. Thus, it is clear from the Plaintiff's own testimony that the principal motivation behind her continued involvement with Debtor and these various transactions was not the result of the Debtor's representations, but rather her own desire to aid a friend in need.

The unfortunate but true reality is that the real estate market collapsed in 2008-2009 and many other investors, developers, and persons similarly situated to the parties herein lost substantial sums of money on these types of investments and building projects. When asked at trial whether the Debtor made an effort to pay Plaintiff the amounts owed to her, the Plaintiff responded: "Sure, he did try to help me get [repaid]." See February 7, 2013 Audio Transcript 12:33:15 P.M. This Court is not unsympathetic to the losses incurred by the Plaintiff as a result of the above transactions and notes that Debtor has likewise suffered severe losses as a result of

the same. However, Plaintiff has failed to prove by a preponderance of the evidence that her claim against the Debtor was procured by fraud. Judgment will be granted to the Debtor finding no cause to hold Plaintiff's debt nondischargeable.

                                                    BY THE COURT:

                                                    Honorable Gloria M. Burns
                                                    United States Bankruptcy Judge

Dated:   March 27, 2013